IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

DR. TARRON RICHARDSON,

    Plaintiff,

v.                                Case No. 3:21-cv-45

CITY COUNCIL OF THE CITY OF
CHARLOTTESVILLE, HEATHER HILL,
LISA ROBERTSON, NIKUYAH WALKER,
AND JOHN BLAIR,

    Defendants.

## LISA ROBERTSON'S BRIEF IN SUPPORT OF MOTION TO DISMISS

### I.      INTRODUCTION

Tarron Richardson ("Plaintiff") served as City Manager for the City of Charlottesville ("City") for 16 months before resigning in September 2020.  Despite signing a release and waiver of claims in exchange for a $205,000 severance, Plaintiff has sued City Council, former City Councilmember Heather Hill ("Hill"), former Mayor Nikuyah Walker ("Walker"), former City Attorney John Blair ("Blair")—who succeeded Plaintiff as City Manager—and City Attorney Lisa Robertson ("Robertson")—who became Acting City Attorney following Plaintiff's separation from employment—to void a contract that Plaintiff now alleges violates public policy, and simultaneously assert the City's breach of that contract.  Plaintiff also attempts to allege violations of his First Amendment right to freedom of speech, as well as violation of Article I, Section 12 of the Constitution of Virginia.

The Complaint does not state a claim against Robertson, as she did not personally deprive Plaintiff of his First Amendment rights.  Plaintiff waived his claims against the City, as well as its employees and officials by signing the release, his speech was not protected by the First

Amendment, he released his claims, and Robertson is entitled to qualified immunity. Additionally, there is no private right of action for Plaintiff under Article I, Section 12 of the Constitution of Virginia, and Robertson was not a party to the contract Plaintiff seeks to void or which was allegedly breached.   The Complaint against Robertson must be dismissed with prejudice.

## II.   ALLEGATIONS[1]

Plaintiff served as City Manager for the City from May 13, 2019 through September 2020.  (ECF Doc. 3, at ¶ 4.)  Blair was the City Attorney during that time period.  (*Id.* at ¶ 9.) After determining that the relationship between Plaintiff and the City was no longer beneficial, Plaintiff and the City entered into an Amendment to his Employment Agreement on September 11, 2020, which indicated that Plaintiff's last day of employment with the City would be September 30, 2020.  (Amendment to the Charlottesville City Manager Employment Agreement, attached as Ex. A (hereinafter "Amendment").)   The Amendment provided that "the Parties agree that the interests of the Council and [Plaintiff] would best be met by a mutual dissolution of [Plaintiff's] employment relationship with the City of Charlottesville."  (*Id.*)

Plaintiff and the City also entered into an Agreement to Release of Claims on September 11, 2020.  (Agreement to Release of Claims, filed under seal as Ex. B (hereinafter "Release").) The Release not only released all claims Plaintiff had against the City and its employees arising out of his employment with the City, but also contained a mutual non-disparagement provision:

> [Plaintiff] and City agree, subject to any obligations [Plaintiff] may have under applicable law, that neither party will make or cause to be made any statements or take any actions that disparage or in any way damage the reputation of the City or any of its agents, officers, or employees, or of [Plaintiff].  In this regard the City shall include all members of City Council, the City Manager, the City Attorney

---

[1] Robertson will only outline those allegations in the Complaint that are pertinent to her and the present Motion to Dismiss.

and other City employees who are involved with this settlement.  In the event such a prohibited communication is made to anyone, including but not limited to the media, public interest groups and publishing companies, it will be considered a material breach of the terms of this Agreement.  [Plaintiff] and the City agree that they will release a joint statement on September 11, 2020 and that [Plaintiff] and the Mayor of the City of Charlottesville will have a press conference on September 11, 2020.  [Plaintiff] and the City agree that the September 11, 2020 communications will not be a breach or violation of this Mutual Non-disparagement clause.

(*Id.*)  Plaintiff received $205,000 in severance pay.  (ECF Doc. 3, at ¶ 23.)

On September 21, 2020, Plaintiff spoke during the "City Manager Response to Community Matters (From Previous Meeting)" portion of the City Council meeting.  (Video of Sept. 21, 2020 meeting at 30:37, available at https://charlottesvilleva.civicclerk.com/Web/Player.aspx?id=5&key=-1&mod=-1&mk=-1&nov=0 (last accessed Jan. 25, 2022), attached as Ex. C.)  While Plaintiff alleges that he spoke about "racial issues raised by Charlottesville residents and other matters of public concern," (ECF Doc. 3, at ¶ 24), he actually spoke about the SAFER (Staffing for Adequate Fire and Emergency Response) Grant received by the City for funding firefighter positions, past news articles that portrayed him in a negative light, and his budgeting practices and outcomes.  (*See* Ex. C.)

On or about September 22, 2020, C-VILLE-WEEKLY published an article regarding Plaintiff as outgoing City Manager.  (ECF Doc. 3, at ¶¶ 26-28; Ben Hitchcock, *On the record: Departing City Manager Tarron Richardson reflects on his tumultuous tenure*, C-VILLE-WEEKLY (dated Sept. 24, 2020), *available at* https://www.c-ville.com/on-the-record-departing-city-manager-tarron-richardson-reflects-on-tumultuous-tenure (last accessed Jan. 25, 2022), attached as Ex. D.)  While Plaintiff alleges in the Complaint that the article "discussed his belief that 'race played a factor' when it comes to expectations from others at the outset of his tenure,"

(ECF Doc. 3, at ¶ 27), the article actually stated that Plaintiff "implies that his race has played a factor" with respect—not to the City government—but as to The Daily Progress's reporting on his tenure, (Ex. D).

> [Plaintiff] has some choice words for Stout: "He doesn't report the entire story. He reports bits and pieces of it. And for the most part it always portrayed me in a negative light, no matter what I did. All the positive things I've done have never been reported."
>
> When asked why he thinks that is, [Plaintiff] implies that his race has played a factor.
>
> "If you look at a history of The Daily Progress, has it always shown people of color in a positive light? [Plaintiff] asks.

(*Id.*)

Plaintiff alleges that after the C-VILLE-WEEKLY article was published, the City "terminated [him] from office, effective immediately" and that "Blair informed [him] that he was being relieved of his responsibilities as City Manager and . . . that he was prohibited from returning to his office as City Manager." (ECF Doc. 3, at ¶¶ 30-31.)

According to Plaintiff, on January 12, 2021, he informed Robertson—then Acting City attorney—"that he intended to publish an op-ed to 'address the conduct and leadership failure of the City Council and Mayor Walker by name.'" (*Id.* at ¶ 54.) He alleges that he "informed Robertson that he would discuss the City's race problem" and provided an excerpt of his proposed op-ed for her review. (*Id.* at ¶ 55.) According to Plaintiff, "he specifically asked Robertson to provide a 'written response' so that he could 'understand the City's position concerning his op-ed' and the impact it would have on 'the non-disparagement provision' and his 'severance payment.'" (*Id.* at ¶ 56.) Plaintiff then alleges that "Robertson's response made clear that the City would take legal action against [him] if he dared to publish the proposed op-ed 'at his own risk.'" (*Id.* at ¶ 57.) Again, Plaintiff has taken liberties with the facts.

4

On February 9, 2021, Robertson received a letter from Daniel Watkins ("Watkins"), then counsel for Plaintiff, that was dated January 15, 2021, addressed to Robertson in her official capacity.  That correspondence made no mention of an op-ed.  (Letter from D. Watkins to L. Robertson (dated Jan. 15, 2021), attached as Ex. E.)   On February 11, 2021, Robertson responded by telling Watkins: "If your client fails to uphold his own non-disparagement and confidentiality obligations under the agreement, he does so at his own risk."  (Letter from L. Robertson to D. Watkins (dated Feb. 11, 2021), attached as Ex. F.)   Robertson specifically invited Watkins to articulate whether or not he was attempting to seek a mutual release of the non-disparagement provision.  (*Id.*)

On February 12, 2021, Watkins again wrote Robertson and referenced an op-ed that Plaintiff had authored that would "address the conduct and leadership failure of the City Council and Mayor Walker by name."  (Letter from D. Watkins to L. Robertson (dated Feb. 12, 2021), attached as Ex. G.)  That letter provided an excerpt of the proposed op-ed—which is referenced in the Complaint.  (*Compare id. with* ECF Doc. 3, at ¶ 55.)  Additionally, the letter requested a "written response . . . so that [Plaintiff] can understand the City's position concerning his op-ed and its relationship with the non-disparagement provision of the parties' Agreement and the related severance payment."  (Ex. G.)

Robertson responded on February 16, 2021 by email, stating only that she could "simply reiterate the City's position sent to you on February 11, 2021: If your client fails to uphold his own non-disparagement and confidentiality obligations under the agreement, he does so at his own risk."  (Email from L. Robertson to D. Watkins (dated Feb. 16, 2021), attached as Ex. H.) The same day, Watkins indicated that he "presume[d] that [Plaintiff] will forgo the opportunity to submit an OpEd to avoid the 'risk' of adverse action from the City as referenced in

[Robertson's] last email."  (Email from D. Watkins to L. Robertson (dated Feb. 16, 2021), attached as Ex. I.)  It was not until February 19, 2021, that Robertson requested that Plaintiff "preserve all information, records and evidence relating to his agreement with the City for release of claims . . ."—a request that had been mutually made between Watkins and Robertson earlier in their correspondence.  (Email from L. Robertson to D. Watkins (dated Feb. 19, 2021), attached as Ex. J.)

Plaintiff filed suit on November 18, 2021.  (ECF Doc. 1.)  He then filed an Original Corrected Complaint and Demand for Jury Trial on December 15, 2021.  (ECF Doc. 3.)  On January 5, 2022, Robertson was served as City Attorney with a summons directed at the City, as well as a copy of the Complaint.  Out of an abundance of caution, because she is also named as a defendant in the lawsuit, Robertson elected to timely file these responsive pleadings as if she had been personally served on January 5, 2022.

### III.   ARGUMENT

#### A.   Standard of Review.

The purpose of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is "to test the legal sufficiency of the complaint."  *Randall v. U.S.,* 30 F.3d 518, 523 (4th Cir. 1994).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  A claim is "plausible" when the plaintiff pleads facts sufficient to allow the court to draw the reasonable inference that the defendant is liable for the alleged misconduct.  *Twombly,* 550 U.S. at 556.  A court should grant a motion to dismiss, however, where the allegations are nothing more than legal conclusions, or where the allegations permit a court to infer no more than a possibility of

misconduct. *See Iqbal,* 556 U.S. at 678–79. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *See id.* at 678.

The Court need not accept legal conclusions that are presented as factual allegations, *Twombly,* 550 U.S. at 555, or "unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship,* 213 F.3d 175, 180 (4th Cir. 2000). "[L]abels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 557); *see also, Tobey v. Jones,* 706 F.3d 379 at 387–88 (4th Cir. 2013).

The law is clear that "in reviewing a Rule 12(b)(6) dismissal, [courts] are not confined to the four corners of the complaint." *United States ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency,* 745 F.3d 131, 136 (4th Cir. 2014). Indeed, "[Courts] may also consider [materials] incorporated into the complaint by reference . . . so long as they are integral to the complaint and authentic." *Id.*

This Court may consider Robertson's exhibits on her motion to dismiss without converting this motion to a motion for summary judgment.[2] Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the court may refer to documents attached to the Complaint or documents attached to the motion to dismiss that are integral to the complaint and incorporated by reference into the complaint. The Court may also take judicial notice of matters of public

---

[2] Robertson expressly states she does not intend for this motion to be construed as a motion for summary judgment.

record.  *Philips v. Pitt County Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004); *see also Goldfarb v. Mayor and City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015) (observing that a court does not convert a motion to dismiss to a motion for summary judgment when it takes judicial notice of public records).  This includes the video of the September 21, 2020 City Council meeting.  *See Clatterbuck v. City of Charlottesville*, 841 F. Supp. 2d 943, 952 n.7 (W.D. Va. 2012), *rev'd on other grounds* 708 F.3d 549 (4th Cir. 2013).[3]  It also includes the Amendment, Release, correspondence between Robertson and Plaintiff's attorney, and the C-VILLE-WEEKLY article, all of which are referenced, quoted, and relied upon throughout the Complaint.  (*See, e.g.* ECF Doc. 3, at ¶¶ 23, 26-28, 54-59.)  These documents—except for the C-VILLE-WEEKLY article—are also official public records of the City of Charlottesville.

## B.     <u>The official capacity claim must be dismissed.</u>

An official-capacity suit "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent."  *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690 n.55 (1978).  A lawsuit brought against an individual in his official capacity is, therefore, duplicative of a claim brought against the municipality.  *Kentucky v. Graham,* 473 U.S. 159, 165–66 (1985); *Love–Lane v. Martin,* 355 F.3d 766, 783 (4th Cir. 2004). Because official capacity suits are redundant when the government entity has also been sued, they should be dismissed.  *See Satterfield v. City of Chesapeake*, No. 2:16-cv-665, 2017 WL

---

[3] The Fourth Circuit reversed because the District Court considered information from the video of a public meeting that was neither a fact nor was it considered in a light most favorable to the plaintiff.  *Clatterbuck*, 708 F.3d at 557.  Specifically, the District Court relied upon a citizen's comments as evidence of legislative purpose and to find that the ordinance was content neutral and necessary.  *Id.* at 558.  The District Court improperly weighed the evidence on a motion to dismiss.  *Id.*  Here, however, the video is offered to show the statements that Plaintiff made, which he alleges prompted his "dismissal" and are the basis for his claimed First Amendment violation.  Those statements are the proper subject of judicial notice.

11449568, at *6 (E.D. Va. Aug. 31, 2017) (dismissing Title VII and § 1981 claims against individuals in their official capacity as duplicative of claims against the City); *Coffee v. Department of Juvenile Justice*, No. 3:14-cv-262, 2014 WL 3616164, at *1 n.1 (E.D. Va. July 18, 2014) (dismissing official capacity suit as superfluous when entity named as a defendant); *Love-Lane*, 355 F.3d at 789; *Mainstream Loudoun v. Board of Trustees of Loudoun County Library*, 2 F. Supp. 2d 783, 790 (E.D. Va. 1998).

Robertson is currently the City Attorney for the City.   (ECF Doc. 3, at ¶ 7.)   The Complaint seeks to hold Robertson liable in both her official and individual capacities.   (*Id.* at p. 1.)  The official capacity claim against Robertson is duplicative of the claim against the City and, therefore, should be dismissed with prejudice.

## C.   Count One does not state a claim against Robertson for violation of the First Amendment.

In Count One, Plaintiff alleges that his termination "for engaging in political expression" violated his right to free speech guaranteed by the First and Fourteenth Amendments to the United States Constitution and that the actions were motivated by Defendants' disagreement with Plaintiff's "viewpoint concerning racism in the City's government," therefore constituting "unlawful viewpoint discrimination."  (ECF Doc. 3 at ¶ 64.)  Plaintiff further alleges that the non-disparagement clause of his separation agreement deprives him of his First Amendment right to free speech.  (*Id.* at ¶ 66.)

### 1.   Robertson did not personally act to deprive Plaintiff of his First Amendment rights.

An individual-capacity or personal-capacity suit "seek[s] to impose personal liability upon a government official for actions [s]he takes under color of state law." *Graham*, 473 U.S. at 165.  To hold an individual official liable under § 1983, a plaintiff must affirmatively

show that the official "acted personally in the deprivation of the plaintiff's rights." *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (internal quotation marks and citation omitted). "That is, the official's 'own actions' must have 'violated the Constitution.'" *Williamson v. Stirling*, 912 F.3d 154, 171 (quoting *Iqbal*, 556 U.S. at 676).

There are no allegations in the Complaint that Robertson was in any way involved with the decision to "terminate" Plaintiff's employment. (*See generally* ECF Doc. 3.) In fact, she was not the Acting City Attorney at the time of Plaintiff's separation from employment. (*See id.* ¶ 31 ("City Attorney John Blair informed [Plaintiff] that he was being relieved of his responsibilities as City Manager . . .").) Even if the circumstances under which Plaintiff separated from City employment somehow violated the First Amendment—which Robertson denies—the Complaint does not and cannot state a claim against Robertson individually.

Nor are there any allegations in the Complaint that Robertson personally deprived Plaintiff of his First Amendment rights when she reminded his attorney of the non-disparagement provision of the Release. Robertson advised Plaintiff's counsel that if Plaintiff "fails to uphold his own non-disparagement and confidentiality obligations under the agreement, he does so at his own risk." (Ex. F; ECF Doc. 3, at ¶ 57.) Robertson did not tell Plaintiff that if he published the op-ed litigation would ensue, but advised that if he breached his obligations under the Release then he did so at his own risk. It is the non-disparagement provision itself that caused Plaintiff not to publish his op-ed, not Robertson's communications regarding the provision. (ECF Doc. 3, at ¶ 66 ("Defendants use of the non-disparagement clause to prevent Plaintiff from informing the public about important government actions deprived Plaintiff of his First Amendment right of free speech and to report fully on facts of public concern as guaranteed

by the First Amendment").[4]   Robertson did not personally act to deprive Plaintiff of his First Amendment rights with respect to his proposed op-ed, and is not even a party to the Release containing the non-disparagement provision.[5]

2. **Plaintiff voluntarily entered into the non-disparagement agreement and, therefore, waived his First Amendment right to free speech.**

A non-disparagement clause operates a waiver of the First Amendment right to free speech. *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 223 (4th Cir. 2019).   A person may choose to waive certain constitutional rights pursuant to a contract with the government. *Lake James Cmty. Volunteer Fire Dep't, Inc. v. Burke Cty., N.C.*, 149 F.3d 277, 280 (4th Cir. 1998). Such a waiver is enforceable if it was made knowingly and voluntarily and, under the circumstances, the interest in enforcing the waiver is not outweighed by a relevant public policy that would be harmed by enforcement. *Pee Dee Health Care, P.A. v. Sanford*, 509 F.3d 204, 212 (4th Cir. 2007).

In *Overbey*, the Fourth Circuit held that a non-disparagement clause in a settlement agreement was not enforceable. *Overbey*, 930 F.3d at 226.   The plaintiff in that case sued three Baltimore police officers alleging that they had beaten, tased, verbally abused, and needlessly arrested her in her own home after she called to report a burglary. *Id.* at 220.   She eventually settled her lawsuit and signed a settlement agreement that contained a non-disparagement clause that limited her public comments about her lawsuit "to the fact that a satisfactory settlement occurred involving the Parties" and prohibited her from discussing "any opinions, facts or

---

[4] While Plaintiff asks the Court to focus only on the non-disparagement provision of the Release, the Release also prohibited Plaintiff from sharing confidential information obtained by virtue of his position as City Manager.  (*See* Ex. B.)

[5] Additionally, Robertson's communication with Plaintiff's attorney is not sufficient to allege a "credible threat of enforcement" to support a First Amendment claim. *See Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018).

allegations in any way connected to" her case, the underlying allegations, or the settlement process.  *Id.*  There were no restrictions placed on the defendant city's freedom to speak about the case.  *Id.*  If the plaintiff violated the clause the defendant city would be entitled to a refund of half of the settlement.  *Id.*  The Fourth Circuit concluded that the public interest in debate on public issues like police misconduct, as well as the cautious mistrust of governmental power outweighed the defendant city's interest in enforcing the non-disparagement clause.  *Id.* at 224-25.  According to the Fourth Circuit, the defendant city should not be permitted to settle a police misconduct case and then preclude the plaintiff from speaking about that case, when public discourse was necessary to ensure accountability for the alleged abuses.  *First Amendment—Nondisparagement Clauses—Fourth Circuit Holds that Nondisparagement Clause in Settlement with the Government Violates the First Amendment*, 133 Harv. L. Rev. 1460 (February 2020).

The provision at issue in the present case, however, stands in stark contrast to the non-disparagement provision in *Overbey*.  Here, the non-disparagement provision is **mutual** and restricted both the City and Plaintiff.  (Ex. B.)  Furthermore, it prevents Plaintiff and the City from making or causing to be made "any statements or tak[ing] any actions that disparage or any way damage the reputation of the City or any of its agents, officers, or employees, or of Dr. Richardson."  (*Id.*)  Unlike the public issue of police misconduct involved in *Overbey* and the necessity for accountability and transparency, the Release resolved an employment matter and the parties' interests in protecting their reputations as both an employer and employee outweigh any public policy at issue.  "[G]overnment offices could not function if every employment decision became a constitutional matter."  *Connick v. Myers*, 461 U.S. 138, 143 (1983).  "Public employees, moreover, often occupy trusted positions in society.  When they speak out, they can

express views that contravene governmental policies or impair the proper performance of governmental functions." *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006).

The non-disparagement provision is enforceable, Plaintiff voluntarily waived his First Amendment rights, and his claim should be dismissed with prejudice. *See, e.g., Henley v. Cuyahoga County Bd. of Mental Retardation & Dev. Disabilities*, 141 F. App'x 437, 445-46 (6th Cir. 2005) (holding a mutual non-disparagement clause in a settlement agreement that provided that the parties "agree to refrain from making disparaging remarks about the other" was enforceable).

### 3.     Plaintiff released all claims related to his employment.

Plaintiff tendered his resignation and agreed that his final date of employment would be September 30, 2020.  (Ex. A; ECF Doc. 3, at ¶ 23.)  He alleges that he was "constructively terminated" and that the City then accelerated his termination after his September 21, 2020 public comments and the September 22, 2020 C-VILLE-WEEKLY article.  (ECF Doc. 3, at ¶¶ 23-24, 26, 29-31.)  Plaintiff claims that his "early termination . . . for engaging [in] political expression violates his right to free speech . . . ." (*Id.* at ¶ 64.)[6]

As evidenced by the Amendment, the City and Plaintiff agreed to "a mutual dissolution" of his employment with the City.  (Ex. A.)  As part of that "mutual dissolution," Plaintiff released all claims related to his employment with the City, including specifically claims against all City employees and the City Attorney.  (Ex. B.)  He released:

> All claims, actions or rights of any sort, know[n] or unknown, suspected or
> unsuspected, arising on or before the date that [Plaintiff] signs this Agreement,
> including but not limited to: . . . (3) any and all claims under any law of any

---

[6] City Council is the governing body for the City and has the sole authority to hire and fire the City Manager.  City of Charlottesville Charter § 5.  Plaintiff does not allege that City Council took any action to terminate him after he agreed to resign effective September 30, 2020.  (*See generally* ECF Doc. 3, at ¶¶ 23-31.)

nation, including any and all claims under any United States of America, federal, state or local law, regulation or ordinance . . .

(*Id.*)

This release bars Plaintiff's claim that he was terminated in violation of the First Amendment. *See Morgan v. Federal Home Loan Mortg. Corp.*, 172 F. Supp. 2d 98 (D.D.C. 2001) ("Under Virginia law, this form of general release is enforceable whether plaintiff knew that he would be or had been injured by acts taken before its effective date") (citing *Va. Impression Prods. Co. v. SCM Corp.*, 448 F.2d 262, 265 (4th Cir. 1971)).

### 4. Plaintiff's September 21, 2020 comments and statement to the C-VILLE-WEEKLY are not protected by the First Amendment.

The First Amendment protects public employees from being fired in retaliation for speaking on matters of public concern. *See McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998) (citing *Pickering v. Board of Educ.*, 391 U.S. 563, 573 (1968)).  To decide whether a public employee has stated a claim for retaliatory discharge under the First Amendment, courts must determine:

(1)     whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest;

(2)     whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and

(3)     whether the employee's speech was a substantial factor in the employee's termination decision.

*Id.* at 277–78.  The first two factors are questions of law to be decided by the court.  *Lane v. Anderson*, 660 F. App'x 185, 191 (4th Cir. 2016).

"[W]hen public officials make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not

insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421.  "Because almost anything that occurs within a public agency could be a concern to the public," the Court's inquiry must "not focus on the inherent interest or importance of the matters discussed by the employee," but on **"whether the speech at issue in a particular case was made primarily in the plaintiff's role as a citizen or primarily in his role as an employee."** *DiMeglio v. Haines,* 45 F.3d 790, 805 (4th Cir. 1995) (quoting *Terrell v. University of Texas System Police,* 792 F.2d 1360 (5th Cir. 1986)) (noting that courts should make a practical inquiry into the actual duties and tasks performed by the employee to determine if the speech was undertaken in the scope of the employee's professional duties); *Nolan v. Terry*, No. 7:04-cv-00731, 2006 WL 2620002 (W.D. Va. Sept. 13, 2006).  When determining whether an employee spoke as an employee or a citizen, the inquiry is whether the speech at issue incurred in the normal course of the employee's ordinary duties.  *Hunter v. Town of Mocksville, N.C.*, 789 F.3d 389, 397 (4th Cir. 2015) (citing *Garcetti*, 547 U.S. at 422).  If so, it is not protected speech.  *Id.  See also Silverman v. Town of Blackstone*, 843 F. Supp. 2d 628, 634-35 (E.D. Va. 2012) (granting a 12(b)(6) motion to dismiss because the former employee did not engage in protected speech when his communications were made pursuant to his job and were made via town email or on sewage plant letterhead).

Here, Plaintiff's comments at the September 21, 2020 City Council meeting were made in the scope of his employment as City Manager.  (*See* Ex. C.)  Additionally, his statements to the C-VILLE-WEEKLY, which appeared in the article published on or about September 22, 2020, were also made in the scope of his employment as City Manager and concerned his position as City Manager.  (*See* Ex. D.)  Therefore, those statements do not implicate the First Amendment and cannot support the First Amendment violation alleged in Count One.

15

5.      **Robertson is entitled to qualified immunity.**

Qualified immunity provides immunity from suit rather than a mere defense to liability. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  **Thus, it should be resolved at the earliest possible stage of litigation.**  *Anderson v. Creighton*, 483 U.S. 635, 646, n.6 (1987) (emphasis added).  Indeed, qualified immunity "is effectively lost if a case is erroneously permitted to go to trial." *White v. Pauly*, 137 S. Ct. 548, 551–52 (2017).  **The safe harbor of qualified immunity ensures that public employees will not be liable for bad guesses in gray areas, but only for transgressing bright lines.** *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992) (emphasis added).

The Supreme Court has outlined a two-pronged test governing qualified immunity.   The first prong considers whether the facts, viewed in the light most favorable to the plaintiff, make out a violation of a Constitutional right.   If they do, the second prong considers whether the constitutional right in question was "clearly established" at the time of the defendants' alleged violation.  *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009).   The Court has discretion to determine which prong to address first.  *Hunsberger v. Wood*, 570 F.3d 546, 552 (4th Cir. 2009).

A clearly established right is not discussed in a generalized fashion, but instead must be defined at a high level of particularity.  *Wilson v. Kittoe*, 337 F.3d 392, 403 (4th Cir. 2003).  **The Supreme Court has reiterated that "clearly established law must be 'particularized' to the facts of the case . . . [o]therwise, plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."** *White*, 137 S. Ct. 548, 552 (2017) (emphasis added).

> [A] court must ask whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted.  If so, then the defendant officer must have been either incompetent or else a knowing violator of the law, and thus not entitled to qualified immunity. If not, however—*i.e.,* if a

reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability.

*Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017).

"A government official violates clearly established law when, at the time of the challenged conduct, the contours of the right are sufficiently clear such that every reasonable official would understand that what he is doing violates that right—in other words, the legal question must be 'beyond debate.'" *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 725 (E.D. Va. 2015) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)). In the Fourth Circuit, the general rule is that only the decisions of the Supreme Court, the Fourth Circuit, and the highest court of the state in which the conduct occurred are relevant. *Doe ex rel. Johnson v. S.C. Dept. of Soc. Servs.,* 597 F.3d 163, 176 (4th Cir. 2010).

For the reasons stated *supra*, the allegations in the Count One do not set forth a Constitutional violation. As such, the qualified immunity inquiry can end without addressing the second prong. Nevertheless, it was not clearly established that Robertson would violate Plaintiff's Constitutional rights by communicating to his attorney—in her capacity as Acting City Attorney—that if he did not uphold the non-disparagement and confidentiality obligations of the Release that he would do so at his own risk. Robertson is entitled to qualified immunity.

**D.    Count Two does not state a claim against Robertson for violation of the Virginia Constitution.**

Count Two of the Complaint mirrors Count One, except that it purports to assert a claim under Article 1, Section 12 of the Constitution of Virginia. That section provides:

> That the freedoms of speech and of the press are among the great bulwarks of liberty, and can never be restrained except by despotic governments; that any citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; that the General Assembly shall not pass any law abridging the freedom of speech or of the press, nor the right of the

people peaceably to assemble, and to petition the government for the redress of grievances.

Va. Const. Art. I, § 12.

There is no state law analogy to 42 U.S.C. § 1983.  Therefore, a private right of action to enforce a claim under the Constitution of Virginia only arises if the provision to be enforced is self-executing.  The Supreme Court of Virginia has provided the following analysis to determine if a constitutional provision is self-executing:

> A constitutional provision is self-executing when it expressly so declares.  Even without benefit of such a declaration, constitutional provisions in bills of rights and those merely declaratory of common law are usually considered self-executing.  The same is true of provisions which specifically prohibit particular conduct.  Provisions of a Constitution of a negative character are generally, if not universally construed to be self-executing. . . . A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be employed and protected, or the duty imposed may be enforced; and it is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law.

*Robb v. Shockoe Slip Found.*, 228 Va. 678, 681-82, 324 S.E.2d 674, 676 (1985).

While Article I, Section 12 appears in the Bill of Rights and contains a provision of a negative character, the self-executing right of action is limited "to only those circumstances in which a party challenges laws enacted by the General Assembly or ordinances adopted by localities."  *Virginia Student Power Network v. City of Richmond*, 107 Va. Cir. 137, 2021 WL 6550451, at *2 (Richmond Cir. Ct. Jan. 20, 2021).  "The conclusion that Article I, Section 12 is self-executing only as to the General Assembly (and other lawmaking bodies) is further evidenced by the fact that it 'is coextensive with the free speech provision of the federal First Amendment.'"  *Id.* at *3 (quoting *Key v. Robertson*, 626 F. Supp. 2d 566, 583 (E.D. Va. 2009)).  *See also Jackson v. Castevens*, No. 7:18-cv-00362, 2020 WL 1052524, at *4 n.6 (W.D. Va. Mar. 4, 2020) (dismissing the plaintiff's claim under Article I, Section 12 because the provision was

not self-executing and did not provide an independent basis for a private right of action).  If the First Amendment was self-executing as to all branches of government, § 1983 would be unnecessary.  *Va. Student Power Network*, 2021 WL 6550451, at *3.

Even if the Court considered Article I, Section 12 to be self-executing, Plaintiff's state constitution free speech claims would rise and fall with his federal claims.  *McCaffrey v. Chapman*, No. 1:17-cv-937, 2017 WL 4553533, at *5 (E.D. Va. Oct. 12, 2017); *Elliott v. Commonwealth*, 267 Va. 464, 473-74, 593 S.E.2d 263, 269 (2004).  Plaintiff's claim under Article I, Section 12 of the Constitution of Virginia thus fails to state a claim against Robertson for the same reasons that Count One fails to state a claim for violation of the First Amendment.

**E.**     **Counts Three and Four do not state a claim against Robertson because she is not a party to the contract.**

Count Three of the Complaint purports to assert a cause of action to find the non-disparagement provision of the Release void *ab initio* as against public policy.  (ECF Doc. 3, at ¶¶ 75-76.)   Count Four of the Complaint alleges a breach of contract against Defendants for allegedly "repeatedly disparaging [Plaintiff] and by removing him from office in advance of the September 30, 2020 date required by the Employment Agreement."  (*Id.* at ¶ 80.)[7]

"The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation."  *Filak v. George*, 267 Va. 612, 619, 594 S.E.2d 610, 614 (2004).

Neither Count Three nor Count Four states a claim against Robertson, as she is not a party to the Amendment or the Release.  (Exs. A-B.)  *See Scheurer-Henry v. Envoy of Richmond,*

---

[7] If the non-disparagement provision of the contract is void, it could not serve as the basis for a breach of contract claim.

*LLC*, No. 3:21-cv-376, 2021 WL 5755335, at * (E.D. Va. Dec. 3, 2021) (citing *Jones v. Pro. Hosp. Res., Inc.*, 35 Va. Cir. 458, 462-63 (1995)) ("Because [the defendant] was not a party to the employment contract, she cannot be held individually liable for breach of contract."); *Velocity Micro Inc. v. JAZ Mktg, Inc.*, No. 3:11-cv-473, 2012 WL 3948018, at *11 (E.D. Va. Sept. 10, 2012) (dismissing claims where defendant was not a party to the contract); *Miller v. Quarles*, 242 Va. 343, 346, 410 S.E.2d 639, 641 (1991) (conceding no liability existed for breach of contract claim against defendant who failed to personally contract with plaintiffs).

Furthermore, the Complaint contains no facts that would support a claim that Robertson breached the contracts even if she was a party to them.  She is not alleged to have been involved in the purported decision to end Plaintiff's employment before September 30, 2020, and is not alleged to have made any disparaging remarks concerning Plaintiff.  Counts Three and Four do not state a claim against Robertson.

## IV.   <u>CONCLUSION</u>

For all of the foregoing reasons, Lisa Robertson, by counsel, respectfully requests that this Court grant her Motion to Dismiss and dismiss the Complaint against her with prejudice.

**LISA ROBERTSON**

By Counsel

 s/Melissa Y. York
David P. Corrigan (VSB No. 26341)
Melissa Y. York (VSB No. 77493)
Counsel for Lisa Robertson
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia  23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
myork@hccw.com

## **C E R T I F I C A T E**

I hereby certify that on the 26th day of January, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Kevin E. Wilson (VSB No. 80033)
Law Office of Kevin E. Wilson, PLLC
801 Wayne Avenue, Suite 400
Silver Spring, MD 20910
703-775-0484 – Phone
kevin@kevinewilsonlaw.com

Keith B. French (Tex. Bar No. 24115073)
Keith B. French Law, PLLC
2010 E. Broadway St., Suite 132
Pearland, TX 77581
832-243-6153 – Phone
832-243-1927 – Fax
kfrench@peoplefirstfirm.com

Voland Brand (Texas Bar No. 24073253)
Brand Law PLLC
3636 N. Hall Suite 610
Dallas, TX 75219
214-932-1472 – Phone
214-932-1473 – Fax
volney@brandlaw.us.com

Richard H. Milnor (VSB No. 14177)
Zunka, Minor & Carter, Ltd.
414 Park Street
P.O. Box 1567
Charlottesville, VA 22902
434-977-0191 – Phone
434-977-0198 – Fax
rmilnor@zmc-law.com

s/Melissa Y. York
David P. Corrigan (VSB No. 26341)
Melissa Y. York (VSB No. 77493)
Counsel for Lisa Robertson
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia  23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
myork@hccw.com